1              UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON
2                      AT SEATTLE

3    _____

4    STEVEN ODSATHER, ET AL,,        )

5              Plaintiff,            ) No. 2:18-cv-00289-JCC

6        vs.                         )

7    FAY SERVICING, LLC ET AL,       )

8              Defendants.           )

9    _____

10       30(B)(6) DEPOSITION UPON ORAL EXAMINATION OF

11                   FAY SERVICING, LLC

12                   MICHAEL PATERNO

13   _____

14                    9:34 A.M.

15               AUGUST 24, 2018

16         3600 15TH AVENUE WEST, SUITE 200

17               SEATTLE, WASHINGTON

18

19

20

21

22

23

24   REPORTED BY:  BETSY E. DECATER, RPR, CCR 3109

25


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                  A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4        ROBERT W. MITCHELL
          Attorney at Law
 5        1020 N. Washington Street
          Spokane, Washington 99201-2237
 6        (509) 840-0003
          robertmitchellattorney@creditlaw101.com
 7

 8
      FOR THE DEFENDANT:
 9
          RYAN M. CARSON
10        Wright Finlay & Zak, LLP
          3600 15th Avenue West
11        Suite 200
          Seattle, Washington 98119
12        (949) 477-5050
          rcarson@wrightlegal.net
13

14

15

16

17

18

19

20

21

22

23

24

25
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1                          I N D E X

2

3    EXAMINATION BY:                          PAGE(S)

4       MR. MITCHELL                          5
        MR. CARSON                            154
5

6

7

8    EXHIBITS FOR IDENTIFICATION              PAGE

9
     Exhibit 1    Notice of Deposition        13
10
     Exhibit 2    Business Lookup Information  14
11
     Exhibit 3    Complaint                    15
12
     Exhibit 4    Limited Power of Attorney    40
13
     Exhibit 5    History of Account, Statements
14                and Correspondence           44

15   Exhibit 6    Notice of Right to Cure
                  Default and Correspondence   68
16
     Exhibit 7    Residential Broker Price
17                Opinion                      79

18   Exhibit 8    Deed of Trust                83

19   Exhibit 9    Greg Home Correspondence     84

20   Exhibit 10   Welcome Letter from Fay
                  Servicing                    103
21
     Exhibit 11   Accurint Report              106
22
     Exhibit 12   Fay Servicing Notes and
23                Memos                        107

24

25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1   EXHIBITS FOR IDENTIFICATION              PAGE

2
    Exhibit 13  Odsather Correspondence      116
3
    Exhibit 14  First American Commitment
4               for Title Insurance          118

5   Exhibit 15  TransUnion Investigation     122

6   Exhibit 16  Equifax Dispute Results      125

7   Exhibit 17  Automated Consumer Dispute
                Verification - Equifax       133
8
    Exhibit 18  1099-Cs                      147
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              SEATTLE, WASHINGTON; AUGUST 24, 2018

 2                          9:34 A.M.

 3                          --oOo--

 4

 5                    MICHAEL PATERNO,

 6      sworn as a witness by the Certified Court Reporter,

 7                   testified as follows:

 8

 9                       EXAMINATION

10   BY MR. MITCHELL:

11      Q.   Okay.  So can you state your name for the record?

12      A.   Michael Paterno, P-a-t-e-r-n-o.

13      Q.   And then you understand the oath that you just

14   took means that you're sworn to tell the truth, correct?

15      A.   Yes, sir.

16      Q.   And testifying here is essentially the same as

17   testifying in court?

18      A.   Yes, sir.

19      Q.   Are you prepared to answer my questions today?

20      A.   Yes, sir.

21      Q.   Not on any medication or anything that would

22   prevent you from giving honest, truthful answers?

23      A.   No, sir.

24      Q.   So the basic ground rules for a deposition -- I

25   assume that you've had depositions before?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   topics that you have some knowledge about?
 2       A.  Yes.
 3       Q.  Okay.  Good.
 4           (Deposition Exhibit No. 2 was marked for
 5   identification.)
 6       Q.  (BY MR. MITCHELL)  And can you describe that
 7   document.
 8       A.  I've never seen this document before, but what I
 9   do believe it is it's somebody's -- and I would imagine
10   you or your office -- looked up Fay Servicing as a
11   business and then this gives you a little bit of the
12   location, address of the business and who the -- you
13   know, what type of company it is and stuff like that.
14   So it just looks like maybe a corporate description of
15   the company.
16       Q.  In your opinion is Fay a collection agency?
17       A.  Yes.  I would say, yeah, we would be doing that.
18   That's part of our business for sure.
19       Q.  How about a debt collector?
20       A.  Yes.
21       Q.  Okay.  That is Exhibit No. 2.  Moving on to 3.
22           Really, the only question I have with that one is
23   have you seen it before?
24       A.  This particular document I had not seen before.
25   I don't recall seeing this one prior to today.
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    it a couple of seconds before you respond so if it's a

2    question he doesn't want you to answer he can instruct

3    you not to answer before you get started.

4        A.  Understood.

5        Q.  All right.  Now I forgot what question I asked

6    him.

7            MR. CARSON:  What laws and regulations guide

8    Fay's business.

9        Q.  (BY MR. MITCHELL)  What laws and regulations

10   govern Fay's business practices?

11       A.  Well, I can guarantee you that I would not be

12   able to name them all.  But you've got CFPB, which is

13   one of the bigger regulatory ones.  You've got the

14   FDCA -- the FDCPA.  There are Federal Trade Laws

15   Commission, the Office of the Controller.  I mean,

16   there's a litany of, you know, things that we're

17   scrutinized by.

18       Q.  Kind of daunting sometimes, huh?

19       A.  It does get kind of overlapping.  And, you know,

20   when we get into training and doing our ongoing

21   training, it's all the acronyms and different things, it

22   gets just kind of confusing at times.  But it's out

23   there.

24       Q.  I can imagine.  I struggle with it, and I do it

25   for a living.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.  Between that time frame.

2      A.  So I would have to say sometime between that time

3  frame and maybe a little bit later into March, April of

4  2018 maybe.

5      Q.  Okay.  But you're fairly confident that by March

6  or April Fay had this in their possession?

7      A.  I'd be pretty confident for that, yes.

8      Q.  So let's go to -- we're going to go to the last

9  page, 198.

10     A.  (Witness complies.)

11     Q.  And the top paragraph.  Can you read that for --

12  I'm going to ask you do you think that that shows that

13  the Odsathers disputed owing this debt?

14     A.  Yes, I would agree with that.

15     Q.  So why didn't Fay report the account as disputed

16  to the credit bureaus?

17     A.  Again, we don't know the specific timing of

18  obtaining these, and there was so much unfortunate

19  misinformation, again, going back to the fact that we

20  don't service non-secured loans.  I mean, there was

21  probably so much misinformation that it was very hard to

22  decipher what information was actually accurate, what

23  was not accurate in order for to us to make the

24  determination that we had eventually come to trying to

25  get this thing resolved.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    Q.  But at this point we can agree that Fay at least
2    knew that the debt was disputed, correct?
3    A.  We did.  But, again, based on -- again, I don't
4    know when this came to us and, again, we were asking for
5    information from Mr. Odsather early on in the
6    conversations and he, you know, was -- again, he was
7    very nice in explaining a couple of times in the
8    conversations that were recorded what the issues were
9    and he was explaining that he was going to get us
10   documentation to back those things up.  But, again,
11   without -- you know, when you get that information from
12   a borrower verbally, you don't immediately say, oh, this
13   is going to be disputed.  So you have to do the legwork,
14   you have to get some backup, you have to get the
15   documentation, and then you have to go through reviewing
16   the information that you have.
17        And, unfortunately, again, in this case the
18   information that wound up to be from HSBC that was so
19   convoluted, it was really hard to draw, again, that
20   picture of what the hell they were trying to accomplish.
21   Q.  Okay.  So then your understanding of the way that
22   Fay works is if a consumer disputes an account, then Fay
23   will investigate that account and, if they figure out
24   that the dispute makes sense, then they will report it
25   as disputed?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1            MR. CARSON:  Object to form.
 2            THE WITNESS:  I think in this particular case,
 3     again, going back to the initial communications with the
 4     Odsathers, it was more verbal.  And based on verbal, you
 5     can't report that it's disputed.  You have to get the
 6     information and then you have to do the research.  And I
 7     don't know -- again, going back on the timing of the
 8     letters and when exactly that Fay knew that this might
 9     have been a valid dispute that we would report it as
10     disputed.
11        Q.  (BY MR. MITCHELL)  Okay.  Based on your research
12     before this deposition, when did Fay learn that this
13     debt was old and should no longer be reported?
14        A.  If I remember correctly from the data that I was
15     looking at, it was probably late in 2017, sometime in
16     December.
17        Q.  Okay.
18        A.  Maybe November, late November, December that it
19     seemed like it started to make more sense, and then they
20     were, I think, making some of the corrective changes at
21     that point.
22        Q.  So I would like to make this part of the same
23     exhibit.  Is that okay?  So 228, it's behind the same
24     tab, it's just a little bit farther in.
25            MR. CARSON:  So it's still behind tab --
```



206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.   What does Fay use these for?

2      A.   That I do not really know.  Obviously, I would

3    imagine there's some pertinent information that they

4    would gather from these, but other than that I don't

5    really have an answer for you without knowing more about

6    these documents.

7      Q.   Okay.  If you don't know, we'll set it aside.  So

8    your binder is going to say 11A.  It's actually going to

9    be 12.

10     A.   Okay.

11          (Deposition Exhibit No. 12 was marked for

12    identification.)

13          MR. CARSON:  Exhibit 11 was the Accurint report,

14    right?

15          MR. MITCHELL:  Yep.

16     Q.   (BY MR. MITCHELL)  So 12 is going to be Bates 237

17    through 248 -- no, excuse me.

18     A.   241.

19     Q.   241.

20          And do you -- what is this document?

21     A.   This is the servicing notes for Fay.

22     Q.   Up there at the top where we see that date again,

23    the due date of 4/24/2014, did that information come

24    from Beneficial?

25     A.   Yes.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    information and figure out what is happening and what's

2    going on.  And, again, there's the confusion there

3    because if we are going forward with foreclosure, well,

4    which deed of trust are we going on?  And I think all of

5    the information and things that we're getting from Mr.

6    Odsather kind of triggered a lot of the confusion as to

7    which way this thing is going to go.

8        Q.  What about, working our way down there, Trey

9    Rodman?

10       A.  Trey works with Fay.

11       Q.  In that foreclosure department?

12       A.  Yes.

13       Q.  What about Trent Lewis, have you heard that name?

14       A.  I don't recall that name, seeing that name.

15       Q.  What about Joanna Clinton, do you know her?

16       A.  That's not another name, again, that's familiar

17   to me.

18       Q.  How about Dawn Talavera, have you heard of that

19   person?

20       A.  Dawn I have not heard of.  It looks like from the

21   notes that she's a Fay employee just based on what's

22   being entered there.

23       Q.  Okay.  Have you looked at these notes before?

24       A.  Yes.

25       Q.  Are you pretty familiar with them?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.   Uh-huh, yes.

2      Q.   Do they show that the Odsathers disputed the

3  account?

4      A.   In the very beginning in the first phone call --

5  and, again, this was the start of the whole verbal

6  process that we talked about -- I think in the -- if you

7  look between seven -- July 18, those conversations that

8  were going on there, that's talking about -- it starts

9  at 7/18/2017 at 3:02:07 p.m. and it starts "the first

10 contact made, spoke with borrower, received call from

11 borrower, he did not want to CIP but did provide his

12 name and phone number, gave the phone number, borrower

13 stated he has been receiving calls from" -- and you have

14 to go from that line up two lines "from Fay servicing,

15 but when he picks up there is no one on the line."

16      And I think that's what was happening with -- it

17 looks like prior to that we had made some phone calls to

18 him and they were probably on the automatic dialer, and

19 I think when he picked up the phone and may have not

20 picked up within a certain number of rings so he was

21 getting nobody on the other line, so he's explaining

22 that to now the person that he's on the phone with.

23      So "borrower stated that this loan was a

24 promissory note originated in 2002, no payments were

25 ever made."  Now you're reading back up another line, so

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    you got to keep reading up a line, "borrower stated the

2    statute of limitations ran out in six years, he

3    attempted reaching out to Household Finance," and it

4    goes on to tell the story, as I said, that Mr. Odsather

5    was open in telling the story.  But, again, at this

6    moment we have only this verbal picture from what he's

7    telling us, and you have to go through the process in

8    order to get the documentation and do that stuff.

9        Q.  But your opinion of the verbal picture was that

10   he was disputing that he owed the debt?

11       A.  Yeah.

12           (Off the record.)

13           (Deposition Exhibit No. 12 was marked for

14   identification.)

15       Q.  (BY MR. MITCHELL)  Do you have that letter in

16   front of you?

17       A.  This is dated September 19, 2017?

18       Q.  Correct.

19       A.  Yes.

20       Q.  And it's from Fay to Odsather, correct?

21       A.  Yes.  It's reference late payment notice.

22       Q.  So do you see the balance there in the middle?

23       A.  I do.

24       Q.  What do you think that represents?

25       A.  That would represent the payment amounts from


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   2014 when HSBC told us that they were -- had defaulted.
 2      Q.  Okay.
 3      A.  So talking about a hundred dollars per month for
 4   whatever number of months plus the interest and late
 5   charge.
 6      Q.  Okay.  Where does the late charge come from?
 7      A.  I do believe I saw the late charge on another
 8   documentation that came from HSBC.  There was -- so in
 9   the transfer of amounts, that would have come over as
10   the late charge.
11      Q.  But do you remember seeing it on the actual
12   agreement to pay $10,000 at a hundred --
13      A.  Plus late fees, no, I didn't see anything about
14   late fees.
15      Q.  I only want to make this an exhibit if you've
16   seen it.  Does that look familiar?
17      A.  I'm pretty sure I saw this one already.  I don't
18   know that -- again, I think this came -- this is not --
19   obviously not on the origination file.  This came after
20   the fact.
21      Q.  It's dated after in September, so it was directed
22   to Fay?
23      A.  Right.
24      Q.  So you're --
25          MR. CARSON:  It's already an exhibit because it's
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    also Bates 2.  It's just a bigger, cleaner version of

2    Bates 2, and that Bates 2 was part of Exhibit 5, I

3    think.

4        Q.  (BY MR. MITCHELL)  Okay.  Do you think that

5    document illustrates that the Odsathers were disputing

6    that they owe the debt?

7            MR. CARSON:  Object to the form; asked and

8    answered.

9            THE WITNESS:  Where are we in the binder with

10   that particular one?

11       Q.  (BY MR. MITCHELL)  The 9/29/17.  Oh, and in the

12   binder it's 14.

13       A.  Okay.

14           MR. CARSON:  No Bates, right?

15           MR. MITCHELL:  No Bates.  Do you want me to make

16   it a new exhibit?

17           MR. CARSON:  It's up to you.

18       Q.  (BY MR. MITCHELL)  So no Bates on this.  This is

19   going to be a new exhibit, and we are up to 13 now.

20           (Deposition Exhibit No. 13 was marked for

21   identification.)

22       Q.  (BY MR. MITCHELL)  So this is Exhibit 13, and the

23   documents that I'm going to ask you to review start

24   behind tab 14 and end behind tab 14.  So there's going

25   to be this group.  And essentially what it is, it looks

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   like handwritten notes and e-mails from the Odsathers to
 2   Fay.
 3       A.   (Witness reviewing document.)   Okay.
 4       Q.   Okay.   Do these documents lead you to conclude
 5   that the Odsathers disputed this debt?
 6       A.   Yes, sir.
 7       Q.   And is there also a supporting document in here
 8   from the man who purchased the house stating that he
 9   purchased the house?
10       A.   Yes, sir.
11       Q.   These are dated in late September and early
12   October?
13       A.   That is correct.
14       Q.   Do you think that based on these documents Fay
15   should have reported the account as disputed?
16            MR. CARSON:   Object to form.
17            THE WITNESS:   I agree that they're in dispute,
18   and based on the time frame of when reporting happens it
19   would not have happened immediately at the time of this
20   -- at the time of these letters.
21       Q.   (BY MR. MITCHELL)   You think after these letters,
22   the next time that Fay reported the account after these
23   letters that Fay should have reported it as disputed?
24            MR. CARSON:   Object to form.
25            THE WITNESS:   Again, without going through
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    their -- having to do their due diligence and, you know,

2    when you get letters from the borrowers, you have to do

3    all of the research to -- I'm trying to -- I just drew a

4    blank on the word I'm looking for, but to confirm the

5    dispute.

6           (Deposition Exhibit No. 14 was marked for

7    identification.)

8        Q.  (BY MR. MITCHELL)  We are on Exhibit 14, but in

9    your binder it will say 15, I believe, First American

10   Title Search or Title Report.

11       A.  Okay.

12       Q.  Do you know did Fay order this?  And these are

13   Bates 252 to 261.

14       A.  (Witness reviewing document.)

15           Yes, we would have ordered this.

16       Q.  Can you look at the very last page, 261?

17       A.  (Witness complies.)

18       Q.  And can you read who the invested owner is on

19   this title report?

20       A.  Michael Lee Ritter and Hiromi Ritter, husband and

21   wife.

22       Q.  And can you bounce back to 254 and read line 1,

23   the date on the commitment date?

24       A.  Commitment date is September 27, 2017.

25       Q.  So do you agree that on or about September 27,

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1   borrower back to Equifax, and then obviously it would
2   come back to us.  But it is -- it does take some time.
3   I mean, it's not an overnight process where, you know, I
4   could send it to them -- we would be sending it right to
5   them for three months in a row, and they may not get it
6   right.
7       Q.  So what you were just describing is actually
8   called an ACDV, and we're going to find it at Tab 28 in
9   your book.  And we're going to make it 17, Exhibit 17.
10          (Deposition Exhibit No. 17 was marked for
11  identification.)
12      Q.  (BY MR. MITCHELL)  And the individual that
13  Equifax says provided this information, her name was
14  Madelyn Feliciano.  Have you heard of her?
15      A.  I have not.
16      Q.  You don't know if she's a Fay employee?
17      A.  I do not -- where do you see that?
18      Q.  It is in the top left quadrant.  I'm going to
19  call it quadrant because there's lines and boxes.  It
20  says "responder name" right above that telephone number
21  that starts with 312.
22      A.  Okay, I see that.
23      Q.  So the credit report -- the piece of the credit
24  report that we just looked at when we were talking about
25  how Fay reported it and you said you're not sure if
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1    that's how Fay reported it, just so you know, this
2    document is actually the Automated Consumer Dispute
3    Verification, and this is what the they send to Equifax
4    in response to a dispute.
5        A.   I have seen these.
6        Q.   So if you look about midway down, there is a spot
7    called "narratives" off to the right, about midway off
8    to the right.  Do you see that?
9        A.   Narratives, okay.
10       Q.   Can you read the list of narratives?
11       A.   "Foreclosure process started, real estate
12   mortgage account, historical data, suppressed 180 days
13   ago or more past due."
14       Q.   So stop there.  That's what was being reported?
15       A.   Okay.
16       Q.   And below that is what Fay told Equifax in
17   response to this dispute.  Can you read that for us?
18       A.   Below that in the same box?
19       Q.   Pretty much.  There's a line, it starts 072 is
20   the note number.
21       A.   Okay.  "Three month" -- I see.  "Three month
22   update."  I don't know what that word says.  I can't
23   read it.  "Charged off account, foreclosure process
24   started, real estate mortgage."
25       Q.   Okay.  And then if you go back up to the top
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   right, it says response date in that -- you see trade in

2   that first left quadrant, I'm going to call it, do you

3   see where it says that the response date is 12/5 of '17?

4       A.  I see that.

5       Q.  So what this tells me is that on December 5th,

6   2017, Fay told Equifax that this account needs to be

7   reported as three month update freeze, which I don't

8   know what that means, but also charged off account,

9   foreclosure process started and real estate mortgages.

10      A.  Okay.

11      Q.  Do you agree that that's what this document says?

12      A.  I do.

13      Q.  So does that change at all what you said earlier

14  about making sure that the credit bureau correctly

15  reports what Fay tells them?

16      A.  In some ways a little bit, but here's a little

17  bit of what I'm a little bit confused on.  This response

18  date is 12/5.  The prior report you're looking at is

19  12/4.  So Equifax had already mailed Sheelagh a letter

20  on December 4th obviously for information that they had

21  up till December 4th or prior, so -- and here's --

22  again, and I understand your questions and I'm -- you

23  had asked earlier about whether we started the

24  foreclosure.

25      Q.  Uh-huh.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1      A.   I don't think we ever started the foreclosure.

 2   HSBC started the foreclosure.  When the loan gets

 3   boarded, the loan is already boarded as a foreclosure

 4   status.  The loan, once it gets boarded to MPS, is

 5   already getting boarded in as foreclosure.  So it gets

 6   reported as foreclosure process started.  Now, I don't

 7   see anything in here or even in -- I had not seen

 8   anything in any of Odsathers' letters other than they

 9   didn't, you know, owe the debt and all that kind of

10   stuff.  But there's nothing that's disputing whether the

11   foreclosure was ever started or not.

12      Nobody has ever said you never started a

13   foreclosure?  No, you need to remove that from my credit

14   report, or that Equifax is saying that did this

15   foreclosure ever start or didn't it.  Because,

16   obviously, from the information that we got from HSBC,

17   it did start and it hit the system from day one as soon

18   as that process started.  So from day one it gets

19   reported to Equifax that, yeah, the foreclosure has

20   started.

21      I think the charge-off part was probably up --

22   and maybe it was charged off right here at this time

23   frame, and I do think if you went back to the notes that

24   we had, the Fay notes, I think right in the middle of

25   November we were talking about the charge-off note.  So
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1    right away from that charge-off period to the first
 2    reporting, now we're reporting that it's charged off.
 3          So I'm not -- I don't necessarily discount -- I'm
 4    not -- I shouldn't use that word, but the information
 5    that's here is reported properly for the information
 6    that we had.  And it's a hard -- it's -- I understand
 7    how confusing it can be, but from day one, as far as we
 8    were concerned, we had a -- or should have had a secured
 9    note in foreclosure that was defaulted since 2014 and
10    all of these things going forward.  You talk to Mr.
11    Odsather, and this process starts.
12          But, again, going back to the information from
13    when Mr. Odsather started saying that I don't owe this
14    debt and all this kind of stuff, it didn't change the
15    fact that the foreclosure had started and what was being
16    reported to the agency.  And there was nothing to tell
17    us along the way that foreclosure hadn't -- you know,
18    that you should change that part of it because as far as
19    we were concerned the foreclosure did start and it was
20    still -- you know, it was still kind of moving forward
21    until we're trying to find all this information and get
22    all of this information going.
23          When it went to charge-off, the foreclosure was
24    still started.  Even though it went to charge-off, it
25    was still at some point started.  So we have not --

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   we're not going to change the information because
 2   nobody -- nobody ever disputed the fact that there was a
 3   foreclosure started.  Mr. Odsather disputed that he owed
 4   the debt and all that kind of stuff, but I don't know if
 5   he ever disputed that the foreclosure had started.
 6       Q.  Well, Beneficial did.  If you remember the
 7   exhibit that we looked at, Beneficial wrote a letter
 8   specifically stating no foreclosure was started and we
 9   apologize for the confusion.
10       A.  Right.  But I think that --
11       Q.  And that was in Fay's records.
12       A.  I don't remember the dates of those letters and
13   when --
14       Q.  I think they were 2015, if I remember correctly.
15       A.  Okay.
16       Q.  And you agree that they were in Fay's records, so
17   Fay knew that no foreclosure had started.  Whether they
18   actually reviewed the documents and understood what that
19   meant, I mean, we've already been through that with the
20   Beneficial documents.
21       A.  I don't recall the actual time of that.
22       Q.  But you do remember that document that says no
23   foreclosure started and we apologize for the confusion?
24       A.  Well, again, I'd have to go back and look at my
25   records.  I was pretty sure that I saw a default letter
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com